Timothy Corson appeals from a judgment entered against him and in favor of Universal Door Systems, Inc. ("Universal"), in Universal's action alleging that Corson had violated a nonsolicitation covenant contained in his employment contract with Universal. We reverse and remand.
In August or September 1985, Corson accepted employment with Universal, a company engaged in selling, installing, and servicing automatic doors. At Universal, Corson served as a service and installation technician. His position not only offered him "hands-on" experience with door installation and repair, but required him to engage in some measure of public relations work with owners and managers of establishments utilizing automatic doors. While he was employed by Universal, the company's *Page 567 
customers included Handy Dan, Delchamps, Sam's Wholesale Club, Service Merchandise, St. Vincent's Hospital, Druid City Hospital, and the divisions of Bruno's.
Corson, during the course of his employment, signed a number of agreements placing various restrictions on his post-employment activities. On September 26, 1985, he signed an employment contract prohibiting the solicitation of Universal's customers within Alabama and the panhandle of Florida for one year following the termination of his employment. On January 13, 1989, after more than three years of employment with Universal, Corson signed a second "employment contract." The relevant portions of that contract provided:
 "[Article Five — Trade Secrets] The Employee, during the term of his/her agreement, will have access to and become familiar with the various trade secrets, customers, and business information, records and specifications which are owned by the Employer and which are regularly used in the operation of business of the Employer. The Employee shall not disclose any of the aforesaid trade secrets, directly or indirectly, or use them outside the business of the Employer in any way that would be detrimental to the interests of the Employer, either during the term of [his/]her employment or thereafter. All files, records, documents, specifications, equipment, and similar items relating to the business of Employer, whether prepared or created by the Employee or otherwise coming into his possession, shall remain the property of the Employer and Employee shall not remove such property under any circumstances whatsoever without the prior written consent of Employer.
". . . .
 "[Article Seven] The employee expressly covenants and agrees, which covenant and agreement is of the essence, that at no time during the term of this contract or for a period of one year immediately following the termination of his/her employment, either voluntarily or otherwise, will he/she, for himself/herself or in behalf of any other person, partnership, or corporation, call upon any customer of the employer for the purpose of soliciting sales to such customer [of] any product or services associated [with] or provided by business of the employer.
 "Employee shall not directly or indirectly, for himself/herself, or in behalf of any other person, partnership, or corporation solicit, divert, or take away any customer of the employer during the term set out herein. This covenant shall extend through the following states: Alabama, Georgia, Tennessee, Kentucky, Florida and North Carolina, South Carolina and Mississippi in those areas where employer regularly conducts business.
". . . .
 "Attorney's Fees and Costs. If any action in law or equity is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which he may be entitled or which may be granted by the court."
On April 6, 1989, Corson resigned and accepted comparable employment as a "service manager" with Alabama Door Systems, Inc. ("Alabama Door"), one of Universal's competitors. On June 23, 1989, Universal sued Corson, seeking a preliminary and permanent injunction, as well as damages, for his alleged solicitation of Universal's customers in violation of the nonsolicitation covenant. At a hearing on September 6, 1989, the trial court denied Universal's request for a preliminary injunction. However, on May 8, 1990, after a second hearing, the trial court permanently enjoined Corson from "calling upon any customers of Universal . . . on behalf of himself or any other person . . . for the purpose of soliciting sales to such customer of any product or service provided by the business of Universal," in an area "covered by the states of Alabama, Georgia, Tennessee, Florida and Mississippi." The trial court also assessed damages in the amount of $7,935, and awarded Universal $8,427 in attorney's fees. On appeal, Corson contends *Page 568 
that the trial court erred in (1) finding that the contract was supported by consideration, (2) granting Universal's request for a permanent injunction covering an area more restricted than that stated in the agreement, in effect, reforming the contract, (3) restricting the defendant in the performance of his trade, (4) awarding damages in an amount for which, he argues, no evidence was produced, and (5) holding that Corson had misappropriated confidential information.
 I. CONSIDERATION
Corson contends that the employment contracts containing the nonsolicitation clauses, and especially the contract executed after three years of employment, were unsupported by consideration. This Court has previously held that continued employment and compensation in return for a promise not to compete constitutes consideration. Thus, in Daughtry v. CapitalGas Co., 285 Ala. 89, 229 So.2d 480 (1969), where Daughtry signed, after nearly five months of employment, a contract containing a noncompetition covenant, this Court said:
 "We are of the opinion that the valid consideration for signing the contract was the continued employment of Daughtry by Capital Gas under the contract (from June 1, 1966, to February 1, 1967) during which time he performed services for the company for which he was compensated, [and] the apparent willingness of the company to continue to employ him in the future. . . ."
Id. at 92-93, 229 So.2d at 483. See also Affiliated PaperCompanies v. Hughes, 667 F. Supp. 1436 (N.D.Ala. 1987). We here reaffirm that principle.
 III. REASONABLENESS OF RESTRICTIONS
The parties agree that the nonsolicitation covenant involved in this case represents only a partial restraint on trade and they, therefore, correctly observe that it does not implicate Ala. Code 1975, § 8-1-1. See Hoppe v. Preferred Risk Mut. Ins.Co., 470 So.2d 1161 (Ala. 1985); Famex Inc. v. Century Ins.Services, Inc., 425 So.2d 1053 (Ala. 1982). Corson contends, nevertheless, that the nonsolicitation provision was unreasonably restrictive, both as to territory and as to persons restricted.
Regarding territorial restrictions, the 1989 contract prohibited solicitation of Universal's customers in Alabama, Georgia, Tennessee, Kentucky, Florida, North Carolina, South Carolina, and Mississippi. It is undisputed that Universal did no business in Kentucky, North Carolina, or South Carolina during the term of its affiliation with Corson. Consequently, Corson insists, the territorial restrictions are "glaringly" unreasonable.
Corson's contention would be far more compelling if the contract had contained a covenant not to compete, rather than the less onerous restriction on customer solicitation. We fail to understand how a covenant prohibiting only the solicitation of the employer's customers amounted to any restriction at all on the employee's right to practice his trade in those states in which the employer had no customers. Universal's customer list, moreover, while including some prominent businesses, is relatively small in relation to the total number of Alabama establishments using automatic doors. Consequently, we are unable to conclude that the contract's territorial restrictions rendered the covenant unenforceable.
Corson also contends that Universal had no protectable interest in his employment. We disagree. An "employer has a legitimate interest in restraining the employee from appropriating valuable . . . customer relationships to which he has had access in the course of his employment."Restatement (Second) of Contracts § 188 comment b (1981), quoted in Sheffield v. Stoudenmire, 553 So.2d 125 (Ala. 1989),Calhoun v. Brendle, Inc., 502 So.2d 689 (Ala. 1986), and JamesS. Kemper Co. Southeast, Inc. v. Cox Assoc., Inc.,434 So.2d 1380 (Ala. 1983).
In this case, there was evidence that Corson's responsibility for the development of lasting customer relationships constituted a material component of his job description. *Page 569 
There was also evidence that Universal expended a measure of resources in training Corson for that purpose. Jerry Bess, president of Universal, testified:
 "Mr. Corson was at Besam [Automatic Doors] prior to me hiring him. He worked in the back of the plant and he didn't normally deal with the general public. He dealt with distributors in the automatic door business. . . . I had to teach him how to talk to store managers and so forth, that when you go to a service call, you go into the store, you ask for a time card, you ask to see the manager, you look the manager in the eye, you give him a good handshake, a firm handshake, be courteous to the manager and you talk to that manager in such a manner that he knows that you are a professional and that you're competent in what you're doing. . . . When he would complete the service call, he would fill out a service invoice and go back and see the manager again and talk with this manager again. The basis of this second talk was to make this manager feel confident that the doors were repaired properly and that when he thought of doors breaking down or thought of automatic doors he would think of Tim Corson and Universal Door Systems."
(Emphasis added.)
Moreover, Alabama Door's manager, Jack Cherry, testified that Corson was employed by Alabama Door with the expectation that Corson's personality would "generate new business in the service department" through personal customer contact. We thus conclude that Universal had a bona fide interest in preventing the subversion of the special customer relationships that it employed Corson to build. See James S. Kemper Co. Southeast,Inc., 434 So.2d at 1384 ("clientele acquaintance involved clearly constitute[d] a protectable interest"). Calhoun v.Brendle, Inc., 502 So.2d 689 (Ala. 1986), is clearly distinguishable on its facts and does not support Corson's contention that Universal had no protectable interest in his employment.
 III. REFORMATION OF THE CONTRACT
Corson contends that the trial court evidently found the covenant in the 1989 contract to be unreasonable and so "reformed" it by narrowing the scope of the area covered by the injunction. He further contends that because the covenant at issue does not implicate Ala. Code 1975, § 8-1-1, the trial court was without the power to "reform" the contract. Once the trial court determined that the covenant was unreasonable as to territory, so the argument goes, the covenant was void, absolutely, and the court was without power to enforce it to any extent. Corson argues, in effect, that the only power to reform a covenant involving post-employment restraint derives from § 8-1-1. Although we agree that the covenant does not implicate § 8-1-1, we disagree with Corson's contention that the trial court was without the power to reform the contract.
Assuming, arguendo, that the trial court's actions did have the effect of reforming the contract,[1] such action is consistent with the broad power vested in the courts of this state "to mould relief to meet the equities developed in the trial."Winslett v. Rice, 272 Ala. 25, 31, 128 So.2d 94, 99 (1960);Tyler v. Eufaula Tribune Publishing Co., 500 So.2d 1005, 1008
(Ala. 1986); see also Hoppe v. Preferred Risk Mut. Ins. Co.,470 So.2d 1161 (Ala. 1985) (affirming action of the trial court in narrowing the class of persons whom defendant could not solicit); cf. Ala.R.Civ.P. 54(c) ("final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings").
 IV. DAMAGES
We come now to the most troubling aspect of this case, that is, the amount of damages awarded. The trial court found *Page 570 
that Corson had violated the nonsolicitation covenant by "soliciting and selling installation, service, and maintenance contracts" to those companies that had been customers of Universal during the course of his employment with Universal. Evidence produced at trial supports that finding. Based on remarks made by the trial judge, however, we conclude that the burden of proof as to damages was placed on the wrong party.
 A. Burden of Proof
The covenant at issue prevented Corson only from "call[ing] upon any customer of [Universal] for the purpose of soliciting sales to such customer [of] any product or services associated [sic] or provided by [the] business of [Universal]." Consequently, Corson was liable only for business that he personally, directly or indirectly, diverted from companies dealing with Universal during the time of his employment. Corson was not liable for business flowing to Alabama Door from Universal's customers because of the efforts of others, or for other reasons unrelated to Corson's efforts.
Universal would be entitled to nominal damages for breach of the nonsolicitation covenant upon mere proof that Corson successfully solicited a Universal customer. James S. Kemper Co. v. Cox Associates, Inc., 434 So.2d 1380, 1385 (Ala. 1983). However, in order to collect more than nominal damages, Universal must also prove that it actually lost money because of Corson's breach, that is, that it would have gotten the business that went to Alabama Door. It follows that if Corson could demonstrate other reasons that might have accounted for Universal's alleged loss of business since Corson's termination, Universal's burden of proof on the issues of causation and damages would become more substantial.
At trial, Corson's counsel introduced evidence that Universal shared the market for its products and services with a number of other companies, including Alabama Door and its close affiliate, Columbus Automatic Door. During cross-examination of Universal's president, Mr. Jerry Bess, in which Corson's counsel attempted to establish whether Universal had an exclusive business relationship with any of the companies on its customer list, he was interrupted by the trial judge. The record reveals the following discourse:
 "Q. [By Corson's counsel] Do you want to look at the answer again, because that's how it was framed. This answer, Mr. Bess, was prior to April of 1989 when Mr. Corson left your employment. Let me read it again. 'Is it the contention of the Plaintiff that the customers shown on documents produced by Alabama Door were exclusive customers prior to April of 1989'? And your answer is, 'no.'
"A. [By Mr. Bess] Right. Okay. What's your point?
 "Q. Before Mr. Corson left, there are other folks out there that you are sharing business with on all these customers?
 "A. I'm understanding that we are arguing about him calling on customers, okay? Is that right? I'm trying to understand.
 "Q. I'm not through with my examination. I'm going somewhere.
 "COURT: Counsel, let me tell you something. It's most unusual that someone has an exclusive [business relationship]. . . . It doesn't mean anything. It's not material [as] to whether or not an individual has violated a covenant. So the exclusive — really, it's not material to the case.
 "Counsel: Judge, it is if he is claiming damages as a result of Mr. Corson. We contend —
 "COURT: He's claiming damages as a result of Mr. Corson, and if he's entitled to them. Then, if Mr. Corson got that business, he is entitled to that damage. Maybe someone else would have gotten it if Mr. Corson had not gotten it, but you are going to have to prove that and I don't think you can."
(Emphasis added.)
The line of questioning pursued by Corson's counsel was material and highly relevant *Page 571 
on the issues of causation and damages, that is, in determining whether Universal actually lost revenue because of Corson's breach of the nonsolicitation covenant. Only if Universal had an exclusive relationship with a customer is it reasonably inferable, in the absence of other evidence, that any revenue brought to Alabama Door by Corson would have gone to Universal. The trial judge, therefore, misperceived the purpose and the relevancy of the inquiry into the nature of Universal's relationships with its customers.
In addition, the plaintiff, not the defendant, bears the burden of proof as to the amount of damages to which it is entitled. James S. Kemper Co. v. Cox Associates, Inc.,434 So.2d 1380, 1385 (Ala. 1983). Consequently, the trial judge also erred in requiring Corson to prove that Universal would not, in any event, have gotten the business solicited by Corson.
 B. Amount
The trial court awarded $7,935 in damages. That figure was apparently derived from the sum of Mr. Bess's estimations of the value of work performed by Alabama Door for Handy Dan, Delchamps, Sam's Wholesale Warehouse, and Huntsville Food World store number 13 (one of the Bruno's stores) as a result of Corson's solicitation. Plaintiff's Exhibits 1 and 4 through 6. Mr. Bess's estimations of the fair value of the four jobs were $825, $310, $2,100, and $4,700, respectively.
Although the record supports a finding that Corson successfully solicited jobs performed by Alabama Door at Handy Dan, Delchamp's, Sam's Wholesale Warehouse, and Foodworld number 13, Universal produced no evidence that it would have received the revenue for the work done at Handy Dan, Delchamp's, or Sam's Wholesale Warehouse, but for Corson's breach of contract. On the contrary, testimony revealed that they, and nearly all the companies on Universal's customer list, periodically contracted for products and service with Alabama Door and other competitors of Universal before, during, and after Corson's employment with Universal. Indeed, the only company on Universal's customer list whose business was not regularly shared by Alabama Door or its affiliate was Bruno's, of which Food World is a division. Similarly, there was evidence that before Handy Dan left the market entirely in 1989, it had been sued by a customer for injuries allegedly suffered as a result of a malfunction of doors sold or serviced by Universal.[2] Because Universal thus failed to meet its burden of proof on the issues of causation and damage, the trial court erred in awarding more than nominal damages for work performed by Alabama Door at Handy Dan, Delchamp's, and Sam's Wholesale Warehouse. The judgment of the trial court, to the extent its award exceeded nominal damages for work done at those locations, is reversed.
Of work performed by Alabama Door in alleged violation of the nonsolicitation covenant, only the revenue lost as a result of a job done at Food World number 13 was reasonably attributable to Corson's breach of contract. The manager of Alabama Door testified that the work conducted at Food World resulted from the solicitation efforts of Corson and another Alabama Door employee. The work was performed on April 13, 1989, three days after Corson began work for Alabama Door.
A few days later, according to testimony by personnel of Huntsville Food World number 23, Mr. Seelbinder, of the Bruno's maintenance department, telephoned Food World number 23 and asked if Corson had been soliciting its business. Upon learning that he had, Mr. Seelbinder stated that Universal was the only company "authorized" to service doors at Food World. These facts reasonably imply a loss of revenue to Universal as a proximate result of Corson's breach of the nonsolicitation covenant.
The correct measure of damages is the amount of the loss suffered by Universal due to Corson's breach. James S. Kemper Co. Southeast, Inc., v. Cox Assoc., Inc., 434 So.2d 1380,1385 (Ala. *Page 572 
1983); see also P. Walter, Employee Restrictive Covenants: toRestrain or not Restrain?, 91 Com.L.J. 321, 349 (1986). The objective is to restore Universal to the position it would have occupied had it performed the work. B M Homes, Inc., v.Hogan, 376 So.2d 667, 675 (Ala. 1979). The $4,700 awarded by the trial court apparently represented Mr. Bess's estimate of thetotal value of work performed by Alabama Door for Food World number 13 and, consequently, significantly overcompensated Universal for its loss.
Universal contends that the award properly contains an amount attributable to punitive damages. We reject that contention. The trial court awarded damages based on its determination that Corson had breached his employment contract. Ordinarily, "[p]unitive damages are not recoverable for breach of contract." Geohagan v. General Motors Corp., 291 Ala. 167,279 So.2d 436 (1973); see also Nolin v. Dismukes, 554 So.2d 1019
(Ala. 1989); John Deere Indus. Equipment Co. v. Keller,431 So.2d 1155 (Ala. 1983). Nothing appears in this case to take it out of that general rule.
The trial court, therefore, erred in its assessment of the damages to which Universal was entitled for the work performed at Food World number 13, and its judgment is reversed as to that issue. On remand, the trial court is instructed to determine the amount of damages based on the net profit lost by Universal for work done at that location.
 V. MISUSE OF CONFIDENTIAL INFORMATION
The trial court also found that Corson had misappropriated and misused a list of "confidential" phone numbers of Universal's customers and personnel. Corson contends that the information contained in the documents was widely circulated and was not held in confidence by Universal. We need not determine whether the information was protectable, because, in any case, Universal failed to produce any evidence of misuse of the information or of damage or loss proximately caused by such misuse, in addition to that which it produced in connection with the work done at the locations previously discussed. Because the award may have been based on the claim of misappropriation of confidential information, the judgment of the trial court is reversed.
 VI. ATTORNEY FEES
Pursuant to the contract provision for an award of attorney fees to the "prevailing party" in the event of litigation "to enforce or interpret the terms" of the contract, the trial court awarded Universal $8,427. That portion of the judgment of the trial court awarding attorney fees is reversed and the cause is remanded for a further determination in light of our disposition of the issues in this case.
 VII. CONCLUSION
The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with the directions set forth in this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
[1] Because the time period covered by the injunction has expired, and because we have determined that the covenant was not unreasonable as written, we offer no opinion as to the propriety of the action of the trial court in defining the scope of the injunction.
[2] Universal was added as a defendant in that suit.